UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SFM REALTY CORP.,

                            Plaintiff,

               -v.-

PATRICIA M. LEMANSKI,

                            Defendant.

20 Civ. 209 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

In hindsight, this case appears to have been an ill-conceived overreach. Plaintiff SFM Realty Corp., reeling from the departure of an executive who then formed a competing business, was understandably concerned about the transmission of confidential materials to its competition.  And when one of Plaintiff's employees, Defendant Patricia M. Lemanski, sent confidential documents to her personal email account, Plaintiff assumed the worst and brought the instant litigation, seeking emergency injunctive relief for alleged violations of the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836.  As the record before the Court suggests, Plaintiff may have jumped the gun.

Defendant has now moved for sanctions against Plaintiff and Plaintiff's counsel, pursuant to Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent power to sanction.  The Court views Plaintiff's hasty decision to litigate as regrettable, and recognizes that it has had devastating personal and professional consequences for Defendant.  But for the reasons set forth in the remainder of this Opinion, the conduct of Plaintiff and its counsel does not warrant sanctions.

**BACKGROUND**[1]

A.    **Factual Background**

Plaintiff SFM Realty Corp. ("SFM"), an entity within The Sapir

Organization ("Sapir", and collectively with SFM, "the Company"), is part of a

real estate investment, operations, and development company with a portfolio

that includes commercial, residential, and hospitality assets.  (Smith Aff. 2).

Defendant worked as a paralegal for SFM beginning in 2011, after holding

similar positions in the real estate departments of several reputable law firms.

(Lemanski Decl. ¶ 3).  Given the demands of her job, Defendant was sometimes

asked to complete tasks outside of her normal work hours, while she was at

home.  (Def. Br. 2-3).  Further, because of technical difficulties that prevented

her from reliably accessing the Company's computer network, Defendant

sometimes emailed documents to her private email account so that she could

work on those documents at home.  (Lemanski Decl. ¶ 4).  Defendant asserts,

and there is no record evidence to refute this assertion, that she did not share

these documents with third parties unless she was asked to do so by her

superiors.  (*Id.*).

On multiple occasions in 2019, Defendant corresponded with Igor

Maslov, the Company's Information Technology Manager, regarding the

---

[1]    The facts in this Opinion are drawn largely from the parties' submissions in connection
with Defendant's motion for sanctions, including Defendant's Memorandum of Law in
Support of Her Motion for Sanctions ("Def. Br." (Dkt. #64)); Plaintiff's Memorandum of
Law in Opposition to the Motion ("Pl. Opp." (Dkt. #72)); and Defendant's Reply
Memorandum of Law in Support of the Motion ("Def. Reply" (Dkt. #75)).  In addition, the
Court has drawn on various declarations from attorneys and witnesses submitted in
connection with Plaintiff's motions for temporary and injunctive relief and Defendant's
motion for sanctions (cited using the convention "[Name] Decl." or "[Name] Aff.").

difficulties she encountered when attempting to access the Company's network remotely.  (Lemanski Decl. ¶ 4; *see also* Maslov Decl. ¶¶ 2-8).  One of those exchanges related to a March 2019 investigation of Defendant's email activity, initiated upon Mr. Maslov's discovery that Defendant had deleted several items from the "sent items" folder of her work email account and had also emptied the "recycle bin" of that account.  (Maslov Decl. ¶ 13).  On March 12, 2019, Mr. Maslov notified his manager, the Company's Chief Executive Officer ("CEO"), about this activity, and reviewed the emails that had been deleted.  (*Id.* at ¶¶ 13-14).  Two days later, still in connection with the investigation, Mr. Maslov observed that Defendant had emailed a document to her personal email account.  (*Id.* at ¶ 15; Smith Decl. ¶ 3).  At his manager's suggestion, Mr. Maslov emailed Defendant to inquire about her conduct.  (Maslov Decl. ¶ 15).  Defendant responded that she had emailed the document to her personal account due to the Company's "antiquated" computer system, which made retrieving documents from home "a pain."  (*Id.* at ¶ 4).

Defendant's superiors were concerned about Plaintiff's conduct, in particular because one of the deleted emails had been sent to another employee who was then under investigation and subsequently terminated by the Company, and who later formed a competing business.  (Hillcock Decl. ¶ 10; Smith Decl. ¶ 3).  Following internal discussions, it was decided that Defendant would be given "a second chance."  (Smith Decl. ¶ 4).  The Company's CEO and its Chief Financial Officer ("CFO") subsequently spoke with Defendant about

her conduct, and the CFO cautioned Defendant not to send any documents to her personal email account going forward.  (Hillcock Decl. ¶ 11).

Prior to the filing of the instant litigation, the last communication Mr. Maslov received from Defendant regarding issues with the Company's remote work system was on August 30, 2019.  (Maslov Decl. ¶¶ 8-9).  And following Mr. Maslov's March 2019 correspondence with Defendant, he did not observe any further incidents with her conduct until January 3, 2020, when, during a routine review, he observed that Defendant had emailed confidential loan modification documents to her personal email account on two occasions that day.  (*Id.* at ¶ 17).  Mr. Maslov alerted Defendant's supervisor, SFM General Counsel Lonica Smith, to the fact that Defendant had sent documents to her personal account despite having been told not to do so.  (*Id.*; Smith Decl. ¶ 2). Following internal discussions with individuals familiar with the prior investigation of Defendant, Plaintiff consulted with outside counsel over the weekend of January 4-5, 2020.  (Smith Decl. ¶ 5).  Each of the two law firms consulted advised Plaintiff to pursue litigation and to terminate Defendant's employment.  (*Id.*).

Plaintiff retained the law firm of Freeborn & Peters to commence an action against Defendant under the DTSA, seeking emergency injunctive relief. (Smith Decl. ¶ 6).  Plaintiff also conducted a search of Defendant's work email account, which search identified several additional emails and documents that Defendant had sent to her personal email account.  (*Id.* at ¶ 7).  These documents included a large "zip" file containing, among other things, the

service contracts for a hotel in New York City that was managed by SFM and owned by one of its affiliates (the "New York Hotel"). (*Id.*). Of note, Defendant had obtained these documents from the hotel operator, rather than from the "drive" that housed documents worked on by SFM's legal department. (*Id.*). Plaintiff concluded that Defendant had no legitimate business reason to have sent the documents to her personal account, as she was not then tasked with any obligation with respect to those documents. (*Id.*). In consequence, Plaintiff was concerned that the documents it had identified represented only the "tip of the iceberg." (*Id.* at ¶ 8).

## B.   Procedural Background

On January 9, 2020, Plaintiff filed their Complaint (Dkt. #1), as well an *ex parte* Order to Show Cause for emergency relief in the form of a temporary restraining order (Dkt. #3). The Order to Show Cause was supported by an affidavit from Ms. Smith and accompanying exhibits. (*See generally* Smith Aff.). Among other things, Ms. Smith attested that Defendant had sent herself documents concerning projects on which she was not working, including documents for which "there [was] no possible legitimate reason Defendant could have to forward" them to her personal account. (*Id.* at ¶ 7). The Smith Affidavit enclosed 15 pages of emails that Defendant had sent from her work email account to her personal email account. (*Id.* at Ex. A).

This Court signed Plaintiff's Order to Show Cause on January 9, 2020, following an *ex parte* hearing. (Dkt. #3). During the hearing, Plaintiff's counsel repeatedly affirmed, when asked by the Court, that the materials Defendant

had sent herself involved projects in which she was not involved.  (Def. Br. 10).
For example, Plaintiff's counsel stated that Defendant had obtained a zip file of
documents from the operator of the New York Hotel "that she had no legitimate
business reason in asking for," as "she was not directed by the company to
request that information."  (*Id.*).

On January 10, 2020, when Defendant arrived at Plaintiff's office, she
was served with the Order to Show Cause and her employment with Plaintiff
was terminated.  (Def. Br. 10-11).[2]  Soon thereafter, multiple articles were
published in *The Real Deal*, a real estate publication, regarding the lawsuit and
the allegations made against Defendant.  (*Id.* at 11-12).  The articles identify
Defendant by name and repeat the Complaint's allegations, for example,
stating that Defendant "allegedly sent countless files, agreements, and other
trade secret and confidential information to her personal Gmail account."  (*Id.*).
The articles remain a top Google search result for Defendant's name.  (*Id.* at
11).

On January 19, 2020, Defendant submitted briefing and supporting
papers in opposition to Plaintiff's motion for a preliminary injunction.  (Dkt.
#21-22).  In her submissions, Defendant represented that, contrary to the
statements made by Plaintiff in support of its Order to Show Cause, Defendant
was involved in each and every matter referenced in the emails sent to her

---

[2]    In an email to Defendant sent the morning of January 10, 2020, Ms. Smith asked
Defendant to confirm that she would be coming to Plaintiff's office that day, as Plaintiff's
"new attorneys [were] coming in" and would "need [Defendant's] help with locating some
documents."  (Smith Decl., Ex. 1).

personal account, and provided work-related reasons as to why she had forwarded each of Plaintiff's document to her personal email account. (Dkt. #21 at 4-11). For example, Defendant explained that she had obtained the zip file of documents related to the New York Hotel at the direction of the Company's CEO, and had forwarded the documents to her personal email account so that she would be able to work on them from home. (*Id.* at 9-10).

On January 21, 2020, the Court held a preliminary injunction hearing in this matter. (Minute Entry for January 21, 2020). During the hearing, Defendant's counsel questioned Ms. Smith about a number of the statements made in the affidavit that she submitted in support of the Order to Show Cause. (Def. Br. 5-7). When questioned about each of the emails attached to her affidavit, Ms. Smith either conceded that Defendant was involved in the underlying project, or acknowledged that Defendant may have been involved in the project. (*Id.*). For example, she recognized that Defendant had "probably" been involved in the New York Hotel project. (*Id.* at 5-6). She also acknowledged that some of the documents sent to Defendant's personal email account did not in fact contain Plaintiff's trade secrets. (*Id.* at 6-8). But Ms. Smith maintained that Defendant was not "working on" many of the documents at the time she emailed them to her personal account, inasmuch as they were final, executed documents that she either had not directly worked on, or had worked on long before she emailed them to her personal account. (Pl. Opp. 8; *see also* Smith Decl. ¶ 12).

Following the hearing, between January 21, 2020, and January 30, 2020, Plaintiff and its forensic data team worked to isolate and remove any documents with confidential and trade secret information from Defendant's personal email account.  (Pl. Opp. 9).  On January 29, 2020, in advance of a subsequent preliminary injunction hearing, Plaintiff submitted affidavits from its CEO, CFO, and Mr. Maslov regarding Defendant's prior connectivity issues, Plaintiff's policy with respect to sending its documents to personal email accounts, and the March 2019 incident involving Defendant's personal email account.  (Dkt. #37-39).  On January 30, 2020, Plaintiff withdrew as moot its motion for a preliminary injunction and voluntarily dismissed the case without prejudice.  (Dkt. #40-41).  Later that day, Defendant filed an application, by order to show cause, to vacate Plaintiff's notice of voluntary dismissal, deny its motion for a preliminary injunction on the merits, dismiss the Complaint with prejudice, and award Defendant attorneys' fees and costs.  (Dkt. #42).

On January 31, 2020, the Court held a hearing on Defendant's application for an order to show cause.  (Minute Entry for January 31, 2020). Following the hearing, the Court ordered Plaintiff to show cause as to the issues raised in Defendant's application.  (Dkt. #44).  On February 13, 2020, Defendant submitted a letter seeking to file the instant motion for sanctions. (Dkt. #53).  At a hearing the next day, the Court denied Defendant's application to vacate the voluntary dismissal, and declined to award attorneys' fees under the DTSA because "there [was] no prevailing party because of the voluntary dismissal without prejudice."  (Dkt. #60 at 6:6-12; *see also* Dkt. #55).

8

However, while the Court lacked jurisdiction to find in favor of either side with respect to the preliminary injunction, the Court retained jurisdiction to consider collateral issues such as sanctions. (*See* Dkt. #55). The Court accordingly granted Defendant's application to file a motion for sanctions and set a briefing schedule. (*Id.*). Defendant filed her motion and supporting papers on March 13, 2020 (Dkt. #64), Plaintiff filed its opposition papers on May 1, 2020 (Dkt. #70-72), and Defendant filed her reply on May 13, 2020 (Dkt. #75).[3]

## DISCUSSION

**A.      The Court Will Not Impose Rule 11 Sanctions**

**1.      Applicable Law**

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that

> [b]y presenting to the court a pleading, written motion, or other paper … an attorney … certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary

---

[3]      On March 11, 2020, Defendant brought a related lawsuit against Plaintiff, alleging wrongful seizure, violations of the Fourth Amendment of the U.S. Constitution, and abuse of process under New York law. *See Lemanski* v. *SFM Realty Corp.*, No. 20 Civ. 2179 (KPF), Dkt. #1. That matter was voluntarily dismissed without prejudice on June 8, 2020. *See id.* at Dkt. #25.

> support after a reasonable opportunity for further
> investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on
> the evidence or, if specifically so identified, are
> reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The rule imposes on attorneys "an affirmative duty to

conduct a reasonable inquiry into the facts and the law before filing." *Bus.*

*Guides, Inc.* v. *Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

The Second Circuit has provided the following guidance concerning the

imposition of sanctions under Rule 11:

> "A pleading, motion or other paper violates Rule 11
> either when it has been interposed for any improper
> purpose, or where, after reasonable inquiry, a
> competent attorney could not form a reasonable belief
> that the pleading is well grounded in fact and is
> warranted by existing law or a good faith argument for
> the extension, modification[,] or reversal of existing
> law." *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir.
> 2002) (internal quotation marks omitted). For example,
> Rule 11 is violated "where it is patently clear that a
> claim has absolutely no chance of success under the
> existing precedents." *Eastway Constr. Corp.* v. *City of
> New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded
> on other grounds by rule.*

*Sorenson* v. *Wolfson*, 683 F. App'x 33, 35 (2d Cir. 2017) (summary order); *see*

*also Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*,

682 F.3d 170, 177 (2d Cir. 2012) (per curiam) (noting that Rule 11 sanctions

for pleadings are subject to an "objective unreasonableness" standard); *cf.*

*Fishoff* v. *Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal

theory is a long-shot does not necessarily mean it is sanctionable. The

operative question is whether the argument is frivolous, *i.e.*, the legal position

has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" (first citing *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir. 2002), and then quoting *Morley* v. *Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995))).

Moreover, sanctions may not be imposed under Rule 11 unless the non-movant has been given "the opportunity ... to correct or withdraw the challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003). This opportunity is guaranteed by the "safe harbor provision" of Rule 11, which "requires initial service of the motion but delays filing or presentation of the motion to the court for 21 days," and then permits filing of the motion only if the challenged submission has not been withdrawn or adequately corrected within the 21-day period. *Id.* at 89 (citing Fed. R. Civ. P. 11(c)(1)(A)). The safe harbor requirement is a "strict procedural requirement." *Malvar Egerique* v. *Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *29 (S.D.N.Y. Apr. 24, 2020) (citing *Star Mark Mgmt., Inc.*, 682 F.3d at 175; *Hadges* v. *Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995)). However, courts within this Circuit have found that "failure to follow the safe harbor provisions perfectly may be excused where there is 'no indication that [a party] would have corrected or amended its frivolous arguments even had it been given the opportunity.'" *Watkins* v. *Smith,* No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *6 (S.D.N.Y. Feb. 22, 2013) (quoting *Perpetual Sec., Inc.* v. *Tang*, 290 F.3d 132, 142 (2d Cir. 2002)).

## 2.    Discussion

Defendant asks the Court to impose Rule 11 sanctions against both Plaintiff and its counsel based on assertions made in support of their *ex parte* request for emergency relief.  Defendant argues that Plaintiff and its counsel made numerous false statements to the Court in their submissions in support of Plaintiff's application for temporary and injunctive relief, as well as during the January 9, 2020 *ex parte* hearing.  (Def. Br. 15-17).  Defendant's view is that had Plaintiff and Plaintiff's counsel discharged their duty to conduct an adequate pre-filing inquiry, they would have determined that Defendant had legitimate reasons for sending the relevant documents to her personal email account.  (*Id.* at 17).  Plaintiff responds that its actions were grounded in its reasonable investigation into Defendant's conduct and, further, that Defendant's motion should be denied because she provided no safe harbor notice.  (Pl. Opp. 13-21).

### a.    The Safe Harbor Provision of Rule 11 Is Not Satisfied

At the outset, the Court addresses the parties' dispute as to whether Defendant complied with the safe harbor provision of Rule 11(c)(2).  That provision requires a party seeking sanctions to serve its motion on the party to be sanctioned, pursuant to Rule 5, affording the party upon whom the motion is served 21 days to correct or withdraw the allegedly sanctionable filing.  *See* Fed. R. Civ. P. 11(c)(2).

Plaintiff argues that Defendant failed to serve her Rule 11 motion on Plaintiff or Plaintiff's counsel 21 days prior to filing the motion with the Court.

12

(Pl. Opp. 17-18).  Plaintiff notes that the Court's February 14, 2020 Order
permitted Defendant to file her motion on or before March 13, 2020, but did
not waive the safe-harbor provision requirement.  (*Id.* at 18 (discussing Dkt.
#55)).  Defendant responds that Plaintiff received sufficient notice from
Defendant's February 13, 2020 letter seeking leave to file a motion for
sanctions.  (Def. Reply 8 (citing Dkt. #52)).  Defendant also argues that any
technical violation of the safe harbor requirements should be excused under
the circumstances.  (*Id.*).

As observed above, the safe harbor requirement is a "strict procedural
requirement."  *Malvar Egerique*, 2020 WL 1974228, at *29 (citations omitted).
And the Second Circuit has determined that "an informal warning in the form
of a letter without service of a separate Rule 11 motion is not sufficient to
trigger the 21-day safe harbor period."  *Star Mark Mgmt.*, 682 F.3d at 176
(collecting cases); *see also Gal* v. *Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 309
(S.D.N.Y. 2005) ("[T]he plain language of the rule states explicitly that service of
the motion itself is required to begin the safe harbor clock — the rule says
nothing about the use of letters.").  As such, Defendant's February 13, 2020
letter indicating her intent to file the instant motion did not provide sufficient
notice for the purposes of the Rule 11(c)(2) safe harbor provision.  Nor did the
Court's February 14, 2020 Order excuse compliance with the safe harbor
provision.  *See Lawrence* v. *Richman Grp. of CT LLC*, 620 F.3d 153, 159 (2d Cir.
2010) (per curiam) (holding that a party may not "ignore" safe harbor
requirements even if it interprets a court's scheduling directive to raise

13

"competing obligations" with Rule 11(c)(2)); *Homkow* v. *Musika Records, Inc.*, No. 04 Civ. 3587 (KMW) (THK), 2009 WL 721732, at *21 (S.D.N.Y. Mar. 18, 2009) (determining that court had not waived the requirement of the safe-harbor provision in holding that plaintiff was not precluded from filing a motion for sanctions).

As a fallback position, Defendant argues that any failure to follow the safe harbor provisions should be excused. In support, Defendant cites a number of cases (*see* Def. Br. 8), including a decision by this Court excusing technical violations of the safe harbor provision where "there is no indication that [a party] would have corrected or amended its frivolous arguments even had it been given the opportunity." *Malvar Egerique*, 2020 WL 1974228, at *29 (citing *Watkins*, 2013 WL 655085, at *6). But this case is markedly different from prior decisions excusing noncompliance with the safe harbor provision. For example, in *Malvar Egerique*, the Court was "certain" that the plaintiff would not have withdrawn or amended his complaint because plaintiff's counsel had stated in writing that he would not be withdrawing his client's complaint, and counsel then proceeded to defend the allegations and claims in the complaint on the merits. *Id.* Here, by contrast, at the time Defendant filed its letter application, Plaintiff had voluntarily dismissed the case, and had withdrawn its application for a preliminary injunction. (*See* Dkt. #40-41). As such, the Court disagrees with Defendant that Plaintiff's counsel demonstrated no intention of withdrawing its pleading (to the extent there was in fact

anything remaining to withdraw).[4]  The Court accordingly cannot consider the

merits of Defendant's motion for sanctions pursuant to Rule 11.  *See ESI, Inc.*

v. *Coastal Corp.*, 61 F. Supp. 2d 35, 68 (S.D.N.Y. 1999) (denying motion for

sanctions "without discussion of the merits" due to failure to comply with the

"mandatory" safe harbor provision).

### b.    Rule 11 Sanctions Are Not Warranted

In the interest of completeness, the Court finds that even were it to

excuse Defendant's failure to comply with the safe harbor provision, it would

find that the conduct of Plaintiff and its counsel does not warrant Rule 11

sanctions.  Defendant argues that a reasonable pre-filing inquiry by Plaintiff

and its outside counsel would have demonstrated that Defendant was involved

in projects related to the documents she had emailed herself.  (Def. Br. 17).

Defendant also cites to several cases regarding counsel's heightened duty of

candor when bringing *ex parte* applications (*id.* at 14-15), and argues that

Plaintiff and its counsel neglected that duty by failing to inform the Court that

Plaintiff might have had legitimate business reasons for sending the emails at

issue (*id.* at 17).  Though it would certainly have been helpful to have brought

---

[4]    Although not raised by Plaintiff in its briefing, the Court notes that the timing of
Defendant's motion may prevent her from pursuing Rule 11 sanctions for a separate
reason, which is that her motion was filed "after all of [Plaintiff's] claims against [her]
had been dismissed or withdrawn" and thus "[Plaintiff] could no longer withdraw [its]
challenged claims." *Rojas* v. *Theobald*, No. 02 Civ. 3623 (DRH) (MLO), 2007 WL
2455133, at *9-10 (E.D.N.Y. Aug. 23, 2007).  The Second Circuit has observed that the
safe harbor provision of Rule 11 "functions as a practical time limit, and motions have
been disallowed as untimely when filed after a point in the litigation when the lawyer
sought to be sanctioned lacked an opportunity to correct or withdraw the challenged
submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003) (noting that
"[t]he Advisory Committee on Civil Rules contemplated that Rule 11 motions would be
deemed untimely if filed too late to permit correction or withdrawal").

to the Court's attention the full extent of Defendant's involvement in the underlying matters implicated by her emails, as well as Defendant's prior incidents of emailing herself documents to enable herself to work remotely, these omissions do not rise to the level of sanctionable conduct.

SFM's General Counsel, Ms. Smith, was first alerted to Defendant's conduct by Mr. Maslov, who was best positioned to recall Defendant's relatively recent issues with working remotely. (Maslov Decl. ¶ 17). As it happened, however, Mr. Maslov had not discussed any such issues with Defendant in several months, and apparently did not perceive any relationship between Defendant's prior connectivity issues and her more recent email activity. (*See id.* at ¶¶ 8-9). Further, Ms. Smith maintains that despite Defendant's involvement in the underlying projects referenced in the documents sent to Defendant's personal account, many of the documents were not currently being "worked on" at the time Defendant emailed them to herself. (Smith Decl. ¶ 12). Thus, while the Court agrees that this matter was brought in haste, it does not find that "any reasonable inquiry into the factual basis of the pleading would have prevented" the case's initiation. *In re Austrl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 264 (S.D.N.Y. 2010).

Following Mr. Maslov's discovery of Defendant's conduct, the matter was escalated to outside counsel, who reasonably relied on the Company's internal investigation concluding that Defendant had misappropriated Plaintiff's confidential and trade secret information. (Lundy Decl. ¶¶ 2-4). *See Hadges*, 48 F.3d at 1329-30 ("[A]n attorney is entitled to rely on the objectively

16

reasonable representations of the client.  No longer are attorneys required to certify that their representations are well grounded in fact." (citations and internal quotation marks omitted)).  The Court is not aware of any intentional effort by Plaintiff's counsel to make false representations to the Court.  *See Omega SA* v. *375 Canal, LLC*, 324 F.R.D. 47, 55 (S.D.N.Y. 2018) (observing that attorney's error in submitting a client declaration that contained falsehoods was "careless" but not intentional, and thus did not warrant sanctions).  Plaintiff's counsel was required to disclose to the Court "all material facts *known to the lawyer*," N.Y. R. Prof'l Conduct 3.3(d) (emphasis added), and the Court believes that it did so.  The Court does not consider itself to be misled, and finds that while Plaintiff and its counsel may have been careless in their haste, they did not violate any obligations or duties that would give rise to Rule 11 sanctions.

## B.     The Court Will Not Impose Sanctions Under Its Inherent Power

### 1.     Applicable Law

Defendant also requests sanctions pursuant to the Court's inherent power.  The Court has "inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman* v. *Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995).  "In order to impose sanctions pursuant to its inherent power, a district court must find that: [i] the challenged claim was without a colorable basis and [ii] the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Enmon* v. *Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d

17

Cir. 2012) (internal quotation marks omitted).  When "polic[ing] the conduct of

attorneys acting on behalf of litigants," *United States* v. *Seltzer*, 227 F.3d 36, 42

(2d Cir. 2000), should a court "invoke[] its inherent power to impose attorney's

fees or to punish behavior by an attorney in 'the actions that led to the

lawsuit ... [or] conduct of the litigation,' which actions are taken on behalf of a

client," the court must make "an explicit finding of bad faith."  *Id.* at 41-42

(quoting *Hall* v. *Cole*, 412 U.S. 1, 15 (1973)).

The Second Circuit has "declined to uphold awards [of attorneys' fees]

under the bad-faith exception absent both clear evidence that the challenged

actions are entirely without color and are taken for reasons of harassment or

delay or for other improper purposes and a high degree of specificity in the

factual findings of the lower courts."  *Wilson* v. *Citigroup, N.A.*, 702 F.3d 720,

724 (2d Cir. 2012) (per curiam) (internal quotation marks and citations

omitted); *see also Milltex Indus. Corp.* v. *Jacquard Lace Co.*, *Ltd.*, 55 F.3d 34,

39-40 (2d Cir. 1995) (reversing sanction because attorney's actions in

representing client were neither "entirely without color [of legal legitimacy]" nor

undertaken with "improper purposes").

### 2.    Discussion

Defendant argues that inherent power sanctions are warranted because

at the time Plaintiff submitted its *ex parte* request for emergency relief, Ms.

Smith knew, and Plaintiff's counsel should have known, that Defendant had

worked on the various matters referenced in the emails sent to her personal

account.  (Def. Br. 20-22).  Defendant argues that Plaintiff's repeated

representations to the Court that Defendant had no legitimate business reasons to access the documents were therefore made in bad faith.  (*Id.* at 23). Defendant also argues that the failure of Plaintiff's counsel to amend such statements following the January 21, 2020 hearing violated the New York Rules of Professional Conduct requiring remedial action in such circumstances.  (*Id.* (citing N.Y. R. Prof'l Conduct 3.3(a)(3)).  Plaintiff rejoins that such sanctions are inappropriate given that: (i) Defendant is not a prevailing party in this action, (ii) Defendant is collaterally estopped from seeking sanctions given the denial of her prior application for an order to show cause, and (iii) Plaintiff's claims were brought in good faith.  (Pl. Opp. 22-25).

The Court disagrees with Plaintiff that sanctions are barred either on the basis that Defendant is not a prevailing party, or on the grounds of collateral estoppel.  To begin, the Court is unaware of a requirement that inherent power sanctions can only be awarded to a prevailing party, and the cases marshaled by Plaintiff do not appear to establish any such prerequisite.  *See DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998) (observing that a federal court's "well-acknowledged inherent power to levy sanctions" allowed it to award sanctions even when not done in accordance with a statute limiting an award only to a prevailing party (quoting *Roadway Express, Inc.* v. *Piper*, 447 U.S. 752, 764 (1980))); *see also Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 46 (1991) ("The imposition of sanctions [where a party has acted in bad faith] transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the

19

dual purpose of vindicating judicial authority without resort to the more
drastic sanctions available for … making the prevailing party whole[.]" (citation,
internal quotation marks, and alterations omitted)).  Further, the Court finds
that it is not collaterally estopped from imposing sanctions by its prior decision
on Defendant's application for an order to show cause.  (*See* Dkt. #55).  The
Second Circuit has determined that "collateral estoppel '[does] not speak to
direct attacks in the same case, but rather appl[ies] only in subsequent
actions.'"  *See Algonquin Power Income Fund* v. *Christine Falls of New York, Inc.*,
362 F. App'x 151, 154 (2d Cir. 2010) (summary order) (quoting *Rezzonico* v. *H
& R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999)); *see also Arizona* v.
*California,* 460 U.S. 605, 619 (1983) ("[C]ollateral estoppel [does] not apply if a
party moves the rendering court in the same proceeding to correct or modify its
judgment.").  Given that the supposedly preclusive order arose in this same
case, rather than a previous action, collateral estoppel does not apply.[5]

Nevertheless, the Court is unable to impose sanctions under its inherent
powers.  While recognizing it as a close issue, the Court concludes on this
record that Plaintiff had a good-faith basis and proper motives for bringing the
instant lawsuit.  Plaintiff and Defendant ascribe significance to the same
event — the March 2019 incident in which Defendant was reprimanded for
sending documents to her personal email account — and both parties ask the
Court to weigh the incident in their favor.  Defendant argues that Plaintiff was

---

[5]     Moreover, the Court's prior decision was cabined to the question of whether it could
award attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), and did not address its
ability to award fees under its inherent power.  (*See* Dkt. #60 at 6:9-12).

obligated to disclose to the Court that in connection with the incident, Defendant had reported her practice of emailing documents to herself to work remotely (Def. Reply 2-3); Plaintiff argues that this incident demonstrates that Defendant had continued to engage in this conduct despite being warned not to do so, giving Plaintiff a good-faith basis for commencing this action (Pl. Opp. 23-24).  The Court sees merit in both readings, and cannot find that Plaintiff's actions were "entirely without color" on this record.  *Oliveri* v. *Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986), *cert. denied,* 480 U.S. 918 (1987); *see also Schlaifer Nance & Co., Inc.,* v. *Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) ("[A] claim lacks a colorable basis when it is utterly devoid of a legal or factual basis.").

Similarly, with respect to Defendant's arguments that Plaintiff's representations to the Court in connection with its *ex parte* application omitted material facts, as stated previously, the Court does not consider itself to have been misled.  The Court finds that, while it would certainly have been beneficial to have had a more comprehensive presentation as to Defendant's prior technical issues and involvement in the underlying projects at the January 9, 2020 hearing, Plaintiff's submissions were nonetheless not made in bad faith. Plaintiff knew that Defendant had emailed herself a number of sensitive documents after being specifically warned not to do so, and given the immediacy of this perceived threat, hastily moved to commence this litigation, and presented the facts that Plaintiff's officers and senior management viewed as pertinent at the time.  While Defendant argues that Ms. Smith knew, and

21

outside counsel should have known, that Plaintiff had a "legitimate" reason to have emailed documents to herself, Plaintiff responds that Defendant's connectivity issues did not constitute a legitimate reason, given the potential risks posed to Plaintiff by this conduct and Defendant's knowledge of those risks.  (Pl. Opp. 24-25).  Further, Plaintiff maintains that a number of the documents were final, executed, and not being "work[ed] on" by Defendant at the time she emailed them to herself, indicating that even upon further inquiry or reflection, Plaintiff might have presented the same, or a similar case to the Court.  (*Id.* at 8).  The Court does not agree that Plaintiff's actions were "entirely justified" on this basis (*id.* at 25), but it does find that "there is no evidence to suggest that [Plaintiff] had utterly no basis for [its] subjective belief in the merits of [its] case," *Schlaifer Nance & Co.*, 194 F.3d at 340.  And the reliance of Plaintiff's counsel on their client's internal investigation does not demonstrate bad faith.  *See Optical Commc'ns Grp., Inc.* v. *M/V AMBASSADOR*, 938 F. Supp. 2d 449, 465 (S.D.N.Y. 2013) (concluding it was not "objectively unreasonable" for counsel to rely on even "suspect" representations by its client, and declining to sanction counsel); *cf. Jimenez* v. *City of New York*, 166 F. Supp. 3d 426, 431-32 (S.D.N.Y. 2016) (finding that attorney acted in bad faith where he demonstrated "'willful blindness" to "absolutely fanciful" statements by his client).

On this record, the Court believes that Plaintiff's submissions to the Court were made with a colorable basis and proper motives, and the Court will not impose sanctions on Plaintiff or its counsel.  *See Schlaifer Nance & Co.*, 194

F.3d at 341 (concluding that given "bases for the appellants' subjective good

faith in [the] action, and in the absence of evidence indicating an absence of a

genuine belief in the validity of the action," the record did not support "an

inference of bad faith").

## CONCLUSION

While the Court finds that sanctions are not warranted, it will readily

acknowledge its view that Plaintiff erred in bringing this lawsuit when it did,

particularly in its *ex parte* application for a temporary restraining order.  It is

unfortunate that Plaintiff does not share this view, and that Plaintiff has done

little to remediate the damage to Defendant's reputation that its litigation has

wrought.  That said, Defendant's motion does not ask the Court merely to

opine on the wisdom of this lawsuit, but to impose sanctions based on the

conduct of Plaintiff and its outside counsel.  And due to the application of the

Rule 11 safe harbor provision, and the Court's belief that Plaintiff and its

counsel brought this action in good faith, the Court is unable to grant

Defendant's motion.[6]

---

[6]     While Plaintiff may be the prevailing party on this motion, given the factual and
procedural history of this case, the Court denies its request for sanctions against
Defendant and her counsel.  (Pl. Opp. 16 n.3 (citing Fed. R. Civ. P. 11(c)(1)(A)).  *See E.
Gluck Corp.* v. *Rothenhaus*, 252 F.R.D. 175, 180 (S.D.N.Y. 2008) ("Although a prevailing
non-movant may be entitled to attorneys' fees when he successfully avoids Rule 11
sanctions, fees are infrequently granted where the motion was not clearly frivolous, filed
for an improper purpose, or not well-grounded in fact or law." (quoting *Goldberg* v. *Blue
Ridge Farms, Inc.*, No. 04 Civ. 5098 (CPS), 2005 WL 1796116, at *7 (E.D.N.Y. July 26,
2005))).

Therefore, Defendant's motion for sanctions is DENIED.  The Clerk of Court is directed to terminate the pending motion at docket entry 64.

SO ORDERED.

Dated:      January 4, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge